Our next case is number 13, 1036, CBT, Flint Partners versus Return Pass. Mr. Conrad, whenever you're ready. Thank you, Your Honor. Good morning, and may it please the Court. The District Court held that a losing party must pay all of its opponents' electronic discovery expenses as the taxable costs of making copies. That ruling was error for at least three reasons. First, it conflicts with Eleventh Circuit law interpreting Section 1920's copying provision with respect to paper documents. Second, two other... I'm sorry, and that law, if I'm remembering right, amounts to the phrase in the footnote five of Allen from way back... It is an old Fifth Circuit case, yes, Your Honor. It's really just that phrase, gathering as a prelude to duplication. That's not covered. So assuming... I mean, that doesn't seem to me to go very far into the many different types of activities involved here. Well, I disagree, Your Honor, because the footnote also says that Section 1920, subsection four, allows recovery only for the reasonable costs of actually duplicating documents. And the phrase, only for the reasonable costs of actually duplicating documents, is as important as the rest of the phrase, which says that the steps that are a prelude to duplication are not recoverable. Tim, could I ask you what exactly is going on here, because it's not so clear to me from the briefs. Let me describe what I understand to be the case, and you can tell me if I'm incorrect. It seems to me that there were three stages here. One was copying the hard drives and creating a database of the copied material. That's step one. Step two was searching that material for relevant and non-privileged information. And step three was then copying the selected information for the requester. Is that a fair statement of what happened? I think that is a fair summary, Your Honor. The only addition I might make is that in addition to the searching in between, there were some other e-discovery processing steps that occurred, like deduplication and decryption and things like that. But the staging is, I think, a fair summary. And you're arguing that only the third step is recoverable, relying on the Third Circuit case. Am I understanding your position correctly? Yes, Your Honor. That's exactly right. We are arguing that the copies that were made for production, which is the third step, is actually recoverable under Section 1920 as taxable costs. And that's exactly what the Third Circuit held in race tires, and also now the Fourth Circuit in the Country-Vintner case. Okay. But I'm wondering if those cases are correct to the extent that they suggest that the copying that occurs at the first stage is not also recoverable. It seems to me you've got a pretty good argument that what was done at the second stage doesn't fall under the copying category, but really is, you know, collecting, gathering, whatever. Right. But so why not the cost of the first step? Two reasons, Your Honor. First, for just what you said about the steps for gathering documents not being taxable, that first stage of copying is a collection stage. That is how documents are collected. So for instance, hard drive imaging. If you're going to collect documents from a custodian, that's what you're doing. The fact that you make copy documents in the course of collecting them doesn't actually make them taxable. The focus of Section 1920 and the copying provision has always been on the copies that are actually produced to the opposing party. I would point you to this Court's decision in the RICO case, actually. Suppose you had, you know, it costs $100,000. Suppose there was no privilege sifting and no relevance sifting in particular, and you just started. I know the request is these two custodians, everything on their hard drives goes, but you've requested metadata, you've requested the things that make the initial putting of that hard drive in a copy version into a database expensive, because you can't just say, email me all the files. You'd lose a lot of information. And then you don't do any sifting or anything, and then you say, well, here's the database. Suppose that costs $100,000, but you want to use it for your, or the producer wants to use it for himself also, and it costs $500 to make the additional copy. Surely the full cost of that initial complicated, expensive imaging of the hard drive, together with the metadata and anything else, is part of the cost of providing you what you requested. I think you've just described this court's decision in the RICO case, actually, where the parties had decided in that case to put all electronic documents into a database by agreement that was then made accessible to the other side. I don't think it's important whether it's what happens once it's in the database. You print out the database, you give access to the database. I'm talking about the expensive part, as I understand it, tell me if I'm wrong, is the into the database. Which wasn't involved in RICO. That's exactly right. In the RICO case, that other part was not involved. Actually, the preliminary part was not involved. The district court in that case, for example, held that it was not used for any other purpose such as to review, filter, search, annotate, or otherwise process documents. So in the RICO case, for example, the database was taxable as a means of production because that was how the copying was done. The cost, my understanding of the cost at issue in that case for the database, were loading the documents into the database and then hosting charges, which my understanding is we don't... We didn't decide because the first step that we had here was recoverable or not recoverable. It just simply wasn't an issue in the case. It simply wasn't an issue in the case. Is your argument that the first step is more akin to what those of us that are as old as I am remember, which is that we spent... Instead of doing this, dumping it onto a database, we would fill a warehouse full of every document out of every executive's office and then send in a horde of young associates, who often was me, to go through all those documents. And the courts have repeatedly said that no matter how expensive that process is, which is really the front end, the most expensive process, that at least under this cost statute, that those costs were not recoverable. That's exactly right, Your Honor, and that's exactly the analogy that the Third Circuit made in race tires and now the Fourth Circuit has made in country vintners. How much of the dollar award that's at issue here involves that kind of review, sifting, gathering, but gathering meaning literally finding here, finding there, finding there, and how much of it involves the electronic, what's expensive in the electronic world, preserving in the way that you requested to be produced the electronic files, either by putting them into TIFFs or saving the metadata or indexing them to make sure you know which What are we talking about? In this case, Your Honor, the defendants have actually separated out their scanning and CD creation costs and those kinds of things. The scanning? Scanning and CD creation. Is scanning Stage 3 or Stage 1 in judgements? That would be Stage 3 of actually creating a new copy. Those costs are not at issue. You've already agreed to pay those costs. They are not at issue at all. We've agreed to pay them and we have not raised those. I guess my question is, what of the costs that are in dispute here are in Judge Dyke's Stage 1? My understanding that all of the rest of the, well, all of the rest of the Some of them are surely in Stage 2. are in Stage 1 and Stage 2. I don't know the breakdown of that because, Your Honor, the defendants have presented this as an all-or-nothing case and the district court decided it as an all-or-nothing case. That doesn't prevent us from treating it as not an all-or-nothing case. That may be true, Your Honor, but that's the explanation for why I don't know exact numbers and the breakdowns of those figures. Now, take Judge O'Malley's paper example. Suppose you go to the executive files and you copy all of those files. That's Stage 1. And then Stage 2, you review them to see what's called for. And then Stage 3, you make a further copy for the requester. In that situation, does the initial copying of the executive files fall within the statute or not? You would say no, I guess, right? It does not, and this court held as much in RICO when it said that Section 1920, subsection 4, allows a party to recover the costs, and I quote, incurred in preparing a single copy of the original documents produced for the opposing party where that copy is supplied to the opposing party. Can I just clarify that? We didn't actually hold that in RICO. RICO was whatever it is by agreement the agreement governs. There were two parts to RICO, Your Honor. There was the duplicating paper version, Part 2, right? But the parts that everybody's talked about here is in Part 1, which ultimately is decided on the ground. The parties had an agreement. The agreement governs. It governed as to costs outside 1920. It governed as to costs inside 1920. So the agreement governed. That's correct, Your Honor. But I was answering the hypothetical with respect to a paper analogy. We did talk about what would be recoverable. I don't think it helps you that much because we weren't, you know, whatever the straight language is in there, we weren't addressing the issue of what we call Stage 1 here. That just wasn't an issue in RICO. Can I ask you about what occurred otherwise before we get to the point of whether because really we're just talking 1920 here, right? There's all kinds of other ways that these costs could have been shifted, correct? Yes, Your Honor. There are a number of fault-based rules under the Federal Rules of Civil Procedure where you can. And as I read the local rules, the Georgia local rules, you had to fill out a scheduling document that included in there a discussion of the parties' agreement about how electronic discovery would be produced and in what format, correct? I believe that's right, Your Honor. And in that document, was there any discussion about fee shifting? No, Your Honor. But the trial court would have had the authority if there was an argument that the agreed-upon formatting was too burdensome. The court would have had the authority to shift fees as a condition of getting the discovery up front, correct? Yes, Your Honor. That's absolutely right. And there was a segment of documents that the district court agreed with defendants were not reasonably accessible and did order cost shifting for those documents but did not for the rest of the documents that are issued here. So as to those documents, you paid an extra $300,000 or whatever? Under the bill of costs or the cost shifting. The cost shifting, the fee shifting. Right. I don't believe that those documents were ever actually produced. Okay. But had you wanted them, you would have had to pay that and the court made that assessment at the time. That's correct, Your Honor. I don't see anything in the docket entry anywhere of any request for protective order that would either prohibit you from getting documents or allow for additional fee shifting beyond that one point. Is that right? I think there may have been a request in the briefing. I don't believe it's in the joint appendix. It may have requested cost shifting for fees that had already been incurred, but the district court obviously didn't order that. It doesn't really matter either way here because the fact that the district court could have had a targeted remedy for cost shifting like that is what really matters. But Section 1920 doesn't serve that purpose because its purpose is to preserve the American rule under which parties bear their own litigation expenses. The question is not whether, as a matter of policy, a trial court should have the authority to do this fee shifting. It's whether they constitute costs under this particular statutory provision. That is precisely the question before the court, Your Honor, and more specifically it's a question of what the Eleventh Circuit would do if it were faced with this case. And we think the Eleventh Circuit would follow the Third Circuit and now the Fourth Circuit rather than creating a circuit split as to any subsection of costs. If I might save some time for rebuttal. Yeah, you want to save the rest of your time. Mr. Gouda, is that how you pronounce it? Godet. Godet. Yes, Your Honor. French pronunciation. From Louisiana. Good morning, and may it please the Court. I'm Matt Gouda here on behalf of both of the appellees. I represent Cisco and I'm presenting an argument with respect to the return pass on the e-discovery issues. We completely agree that the facts break down into those three stages and there's no dispute about stage number three. Looking at the actual facts, and we've got very specific findings in this record, the law allows under the Eleventh Circuit and under NRA-RICO, the law allows recovery under these facts, both stage one and stage two. Why don't you address stage two first because that seems to me to be problematic. Absolutely, Your Honor. And just one quick note about stage one is the entree into stage two. Stage one resulted in the copying of 1.2 terabytes of data. That's like 12% of the volume, so something has to be done with it. It was put into a database organized by GGO. That's the invoice that gave us the vendor that provided this work and provided the 70 pages of invoices. This is the critical fact there that puts this in line with NRA-RICO. The district court specifically found that the review process, that is to say everything that determines what documents are coming out of that database, what terms to use, what that equates to was all controlled by CBT specifically. What CBT did was it started with us saying, hey, what if we run these three terms? Answer the question about stage two, which involves culling the documents for relevancy and privilege. How can it be that that expense is recoverable as cost? It was the equivalent of a production in the same way as it was in NRA-RICO. What happened was— It doesn't involve that question. I wrote the opinion. Let's go back and look at the brief. It doesn't involve that question. As I understand, NRA-RICO, that document database was turned over to the plaintiffs or the losing parties. The losing party could say, I want X, Y, and Z. That's effectively what happened here. In other words, we said, if you want us to run these 10 terms, this is the number of documents specifically that comes out per term. That's not enough. Now we're on these. There were six statistical previews, and CBT chose the 102 terms knowing exactly how many documents that would yield. This GGO that you were referring to, that's the same company that another court refused to give costs because it was so incomprehensible. I finally, going through their invoices, felt they were fairly incomprehensible, but I was able to call out a few of the things they did, such as supporting attorney letter prep, review items with privilege and responsive terms, attorney depot support, declaration support, travel reimbursement analysis, data mining. I mean, how is any of that, that this is all the things that you might want for your own purposes, but how is any of that relevant to the company? Let me set the stage for that, and then I will answer that question very specifically. Setting the stage, at first we provided a general summary of what they'd done. CBT objected that wasn't specific enough, so we put in all the invoices. In terms of the breakdown... I agree, though. I mean, can you understand those invoices? Well, I can understand them well enough, but it was literally what they did. But the summary is that JA-689, JA-690, that's got a table of exactly what they did and how much money was attributed to each one of those things. But are the things that I just listed, do you disagree that those are in the invoices? Those are, but specifically, with respect to the specific objections in the invoices, it's CBT's burden to make objections. They made, apart from the sort of the global one, two, three structure, they made four objections. The first, the ones I believe which you're referring to, well, this is laid out in the blue book at 26... I'm sorry, the blue brief at 26 to 29. The first one was meetings, teleconferences, and related intellectual efforts. That's CB at 26. They did not make that objection in front of the district court. And consistent with the Eleventh Circuit's law and EEOC, having not made that objection, that one is waived. The next was legal work, and I think that includes the providing attorney depot support. And they had four entries they identified there. That actually was made at JA-861 in front of the district court, and they picked out what they thought, I assume, were the worst entries from a standpoint of this might make it look like something was outside of the scope. Well, they have to make specific objections. Those three entries, the one that you referenced, was $300. The first one, reviewing and determining best course of action regarding letter of opposing counsel, was $225. The third one was $125. The last one, meet and confer conference call with adverse party. That was a new one they didn't make in front of the district court. That was $375. The convenience of counsel issues that they identify now, they specifically made in the district court. I totaled those up. For Cisco, it's $1,248. The return path was $131. To cut to the chase here, although all of that was within the context of what was going on with this review database, we'll waive the $2,273 at Cisco and the $131 as the return path for the specific objections they actually made. As I read their objections below, they objected to categories and they pointed out examples of things that fell into those categories. Are you saying that if you charge $50,000 for your lawyers to be prepped for a deposition, that you can recover that as cost? No, and we didn't. If we had done that, they would have pointed it out. The specific objection they made is exactly that $300. But you are trying to recover the cost, as I understand it, for what we call Stage 2, which is reviewing for relevancy and privilege. And I have a very difficult time seeing how that Stage 2 cost can fall under the statute. And, Your Honor, if we had done the review, we would completely agree. What Judge Thrash found, and there was a dispute about whether it was… You hire somebody to do the review so you can recover this cost when you couldn't when you did it yourself? I phrased that poorly. If we had controlled the review, it was CBT. Let me give you the cite on this. The court found this at JA 1383 at paragraph 11. It's an order dated August 2008 that said there was a big discovery dispute about how this 1.2 terabyte that we could have just hit the print button or just given everything, how we got to the set that actually went out the door, and that was entirely determined by CBT, by the losing party, saying, what would happen if you search through this many terms? And the GGO then would give them a statistical preview and say, well, this term hits this many documents. This one hits this many documents. I said, well, what if you change this up? Well, what does that have to do with whether they set the parameters? That happens all the time. Every time there's a discovery request, you specify the documents you want. And the cost of figuring out, of separating the wheat from the chaff, the wheat being the requested documents from the other documents that are in the files, no case suggests that that's recoverable, what I'm aware of. Your Honor, the authority, and understand, it's your opinion. You wrote the opinion. What other authority is there for that? Your Honor, the 11th Circuit, the controlling law in the 11th Circuit on this comes from the Arcadian Fertilizer case. That's the most recent. It's a 2001 case. It's the most recent time that the 11th Circuit actually spoke on the meeting of 1920, in subsection 4. And in that case, Your Honor, the court explained how you figure out whether or not something is or is not within the ambit of the statute. And this is, both parties cited this on the standard review issue, but this is at 1296. The court said, we read copies of papers to mean reproductions involving papers in its various forms and conclude that, and actually the conclusion there was that a copy of something that was made for presentation at trial, a blow-up paper, was recoverable. But the question is whether or not something is capable of being characterized as part of making copies. And what happened here is… So you're not able to identify a case which allows the recovery of the stage 2 fault. Your Honor, and Ray Rico is the closest case to being on point. What I was going to say on this is… Can I ask, I'm trying to gauge, maybe since it's your bills, you can tell me something about this. One of the relevant considerations for interpreting this statute here is how large a change in the world would be affected in sheer dollar terms between what was once a quite modest provision and what might become far from modest provision, and that might have effects on access to the courts and so on. So if one focused just on stage 1, which at least I conceptualize as, or I understand as, involving getting files that are in a thousand employees' hard drives into a single place from which they then can be copied or just reviewed by the other side, including metadata and all that stuff, what kind of dollar volume are we talking about of the amount that's at issue here, putting aside all the culling for relevance and privilege and maybe indexing and maybe some of the other things that are other than just preserving them in the form that, as things stood, you had to produce them? Your Honor, if you look at JA-689 and JA-690, it's got a spreadsheet that basically breaks out the activities by category, and activities 4010 through 4050 are project manage, acquire document control process, data mining, DWR. Those are the processes that would generally correlate to step 1, and so the totals are on JA-690. That's most of the $243,000 here, but again, that was 1.2 terabytes of data equates to, which the court says, in this case, the plaintiff asked for every document in the company, and that's how you got that size. Do you agree that there are a variety of mechanisms by which you could have thought C-shifting as a precondition to responding to the request that the plaintiff gave you? Your Honor, the period of time in which all of this happened, we've been attempting to engage e-discovery parameters with the plaintiff for some time. It was January or so, January or March, when we had a plan, I'm sorry, January or February that we had a plan in place on how to operate. All of this happened within about a two-month period as, you know, more markets. But you did know you could go back to the, you're not answering my question. There are mechanisms. We did, and we did. Okay, so first you've got the standing order that you all have got to fill out. We've got to agree to formatting. So you agree to that. You don't ask for fee shifting at that point. But then you say some of what they want is too burdensome, and the court said, you know, you're right. If you want that stuff, you've got to pay them $300,000. So they said, okay, we won't take it. And then, but then you had the ability. If you didn't want to continue to respond to their additional requests with respect to searching additional words, you didn't have to do that. Your Honor, that actually, the chronology there was not right. Everything happened in that two-month period. When we finally said that's it, we've had it, that was when we said, if you want anything more, you have to pay them $300,000, and court, please give us protection from this. This has gotten out of control. That led to what the court described as 125 pages of briefing and all sorts of accusations back and forth. But that was it. But again, you could have done that in the very beginning. As soon as they made their initial request, because there's a provision that says whatever agreements the parties have, and I understand that the current rules are even being amended to make it easier for courts to do that. But even under the existing rules, under Rule 26, you could have asked for that fee shifting or proportionality analysis at the time that you had your initial e-discovery conference, right? Your Honor, that was in approximately January. We asked the plaintiff to do that. The plaintiff at that point said, well, we don't want to accept any fee shift. There was a discussion with the district court. The district court basically said, come back to me when you've got a problem. Two months later, we came back and this has gotten out of control. And I say that not because we didn't have that option. We did. But as a practical matter, that's why the existence of that option in a discovery process that moves that quickly shouldn't mean that once you are the prevailing party, because we were not a prevailing party then. Once you are the prevailing party, then simply as a matter of course, you're entitled to recover the cost of whatever is necessarily incurred. The problem is fee shifting as a condition of discovery is one thing, and the court has a lot of inherent authority there. You're trying to now take your failure to ask for that fee shifting earlier and to go on the back end and basically put this square peg into a round hole of 1920. Your Honor. And they're different things. Your Honor, with respect, I mean, again, certainly with respect to the first stage, I mean, that is literally what 1920 covers. There's nothing in 1920 about only being a production. Even the definition in race tires and in Country Vintner, the definition of copying is just any image of an original, any reproduction. So, I mean, it's squarely within 1920. And the idea that there's some cap on it because of the notion of it only covering modest fees, I think that's a misreading of the Tarangucci case from the Supreme Court. The Tarangucci case said you interpret the statute. But it's not just that case. I mean, go back to Crawford and others. I agree that policy here doesn't really tell us what the category is, but there is a general policy. Keep costs low so that plaintiffs are not deterred from going to work. Can I just ask you, and I realize this is quite specific, if you look at JA 690, take the big five top categories. Can you briefly in a sentence or so explain what project manage is, what acquired document control is, what process, what data mining, what DWR and review support are? Your Honor, the project manage would generally be being sure that all these processes that are described now in more detail is actually happening the way it's supposed to happen. Acquired document control is the incredibly complex process that requires you to image a hard drive, preserve metadata, as was requested here, and as the Country Vintner case actually said in footnote 19, if that's requested, surely all of that is recoverable. It also includes decrypting documents. It includes dealing with password issues. And for 1.2 terabytes, that's an extraordinary activity. Process means now you've got all this data that's come off an original form. You have to be able to get it to a form that it's actually usable in some sense, and that's much like the Seventh Circuit Pecker case in which the conversion of non-readable data into something that was readable was allowable. Data mining, that again gets into these electronic documents as they exist in original form, have all sorts of different links and… Links or links? Links, L-I-N-K-S, to other documents, things that are embedded. There's a whole process of mining to unearth that stuff and copy it. DWR is… Oh, that's the Digital War Room. That's actually the production database, and that would be… So that would then begin Category 2 along with review support, which would also be Category 2. Thank you. You're welcome. Okay. Thank you, Mr. Corbett. Thank you, Mr. Conrad. I think in rebuttal I'd just like to make one point in going back to the first category of documents. Well, a couple of points about that first category. The first thing I'd like to mention is that the first category about gathering documents and actually putting them, preserving them, putting them into electronic form is exactly what the Allen case talks about. So going back to Judge Toronto's question about how much Allen actually says, it does specifically talk about gathering documents and excludes that activity from Section 1920. So I think… Suppose here that all that had happened was that the employee hard drives had been taken and copied and turned over. In other words, the only stage was Stage 1. Would that have been recoverable as a copying cost? Right. There's a… It probably would have been because that would really be Stage 3 then instead of Stage 1. So if a hard drive was imaged and then directly turned over as a copy, it probably would be recoverable. However, when it's just a data collection step and then you have all of Category 2 and then there's a final production step in Category 3, the first step is something that you can do in a number of ways. You could actually go to that person's desk and take those documents without actually… You could search through them right on the station. Of course, it would be very inconvenient to do. But the fact that it's convenient to do imaging in an e-discovery fashion doesn't make it taxable under Section 1920, and it doesn't put it into the bucket at the end that's actual copying for production, which is the Stage 3 that we've been talking about. Really, at the end of the day, our position is that we're trying to figure out what the 11th Circuit would do here, and there's really no reason to see that the 11th Circuit would break with the 3rd Circuit and the 4th Circuit on this issue, especially in light of the Allen case. As the 4th Circuit found in Country Vintner, the 3rd Circuit properly took into account the statute's history, its plain language, and the Supreme Court's narrow contemporary interpretation of the cost taxable under 1920. Are there no further questions? Okay. Thank you, Mr. Conner. The case is submitted. We thank both counsel, and that concludes our session for the day. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock.